BARKETT, Chief Justice,
dissenting.
I cannot agree with the majority’s conclusions regarding Freddie Lee Hall’s sentence. Specifically, I cannot agree that “the record supports [the trial judge’s] conclusion that the mitigators either had not been established or were entitled to little weight.” Majority op. at 479.
The testimony reflects that Hall has an IQ of 60; he suffers from organic brain damage, chronic psychosis, a speech impediment, and a learning disability; he is functionally illiterate; and he has a short-term memory equivalent to that of a first grader. The defense’s four expert witnesses who testified regarding Hall’s mental condition stated that his handicaps would have affected him at the time of the crime. As the trial judge noted in the resentencing order, Freddie Lee Hall was “raised under the most horrible family circumstances imaginable.”
Indeed, the trial judge found that Hall had established substantial mitigation. The judge wrote that the evidence conclusively demonstrated that Hall “may have been suffering from mental and emotional disturbances and may have been, to some extent, unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.” Additionally, the judge found that Hall suffers from organic brain damage, has been mentally retarded all of his life, suffers from mental illness, suffered tremendous emotional de-. privation and disturbances throughout his life, suffered tremendous physical abuse and torture as a child, and has learning *480 disabilities and a distinct speech impediment that adversely affected his development.
Hall’s mental deficiency as an adult is not surprising. The sixteenth of seventeen children, Hall was tortured by his mother and abused by neighbors. Various relatives testified that Hall’s mother tied him in a “croaker” sack, swung it over a fire, and beat him; buried him in the sand up to his neck to “strengthen his legs”; tied his hands to a rope that was attached to a ceiling beam and beat him while he was naked; locked him in a smokehouse for long intervals; and held a gun on Hall and his siblings while she poked them with sticks. Hall’s mother withheld food from her children because she believed a famine was imminent, and she allowed neighbors to punish Hall by forcing him to stay underneath a bed for an entire day.
Hall’s school records reflect his mental deficiencies. His teachers in the fourth, sixth, seventh, and eighth grades described him as mentally retarded. His fifth grade teacher stated that he was mentally maladjusted, and still another teacher wrote that “his mental maturity is far below his chronological age.”
The U.S. Supreme Court has expressed the view that the Eighth Amendment does not categorically prohibit execution of the mentally retarded. Penry v. Lynaugh, 492 U.S. 302, 340, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256 (1989). Nonetheless, the Court noted in Penry that “evolving standards of decency that mark the progress of a maturing society” may ultimately lead to a national consensus against executing the mentally retarded. Id.; see Troy v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Since Penry was decided, Kentucky, Maryland, New Mexico, and Tennessee have passed legislation exempting mentally retarded people from the death penalty. See V. Stephen Cohen, Comment, Exempting the Mentally Retarded from the Death Penalty:. A Comment on Florida’s Proposed Legislation, 19 Fla.St.U.L.Rev. 457, 468 (1991). Additionally, the Georgia Supreme Court has found that execution of the mentally retarded violates its state constitutional provision against cruel and unusual punishment. Fleming v. Zant, 259 Ga. 687, 386 S.E.2d 339 (1989). The Georgia court wrote:
The “standard of decency” that is relevant to the interpretation of the prohibition against cruel and unusual punishment found in the Georgia Constitution is the standard of the people of Georgia, not the national standard. Federal constitutional standards represent the minimum, not the maximum, protection that this state must afford its citizens. Thus, although the rest of the nation might not agree, under the Georgia Constitution, the execution of the mentally retarded constitutes cruel and unusual punishment.
Id. 386 S.E.2d at 342 (citation omitted).[7]
Floridians’ attitudes toward the mentally retarded have evolved significantly in recent decades. Those mentally retarded people committed to state care no longer are warehoused in “training centers,” and a variety of procedural safeguards have been enacted to protect the rights of those committed to state facilities. See § 393.11, Fla.Stat. (1991) (regulating involuntary admission of the mentally retarded to state residential services); see also David A. Davis, Executing the Mentally Retarded, Fla.Bar.J., February 1991, at 13, 15 (discussing generally how statutes have changed to reflect a more enlightened approach to caring for the mentally retarded).
Society has developed a greater understanding of mental retardation. It is generally recognized now that mental retardation is a permanent learning disability that manifests itself in several predictable ways, including poor communication skills, short memory, short attention span, and *481 immature or incomplete concepts of blameworthiness and causation. Davis, Fla.Bar J. at 13; see also James W. Ellis & Ruth A. Luckasson, Mentally Retarded Criminal Defendants, 53 Geo.Wash.L.Rev. 414, 417 (1985); John Blume & David Bruck, Sentencing the Mentally Retarded to Death: An Eighth Amendment Analysis, 41 Ark. L.Rev. 725, 732-34 (1988). A person who is mentally retarded is not just “slower” than the average person. Mental retardation is “a severe and permanent mental impairment that affects almost every aspect of a mentally retarded person’s life.” Blume & Bruck, 41 Ark.L.Rev. at 734.
It would appear that the trial judge did not understand the nature of mental retardation. Otherwise, he could not have reached the conclusion that the mitigating factors were entitled to little weight because he could not “definitely establish that they affected Hall at the time of the crime.”
This Court has not addressed whether executing the mentally retarded is cruel or unusual punishment under article I, section 17 of the Florida Constitution. I believe.it is appropriate to analyze whether imposition of capital punishment in such circumstances is either “cruel” or “unusual.”[8] First, because a mentally retarded person such as Freddie Lee Hall has a lessened ability to determine right from wrong and to appreciate the consequences of his behavior, imposition of the death penalty is excessive in relation to the crime committed. Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977). As Justice Brennan noted in Furman v. Georgia, 408 U.S. 238, 257, 92 S.Ct. 2726, 2736, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring), a punishment is excessive when it is unnecessary. An excessive punishment “makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering.” Coker, 433 U.S. at 592, 97 S.Ct. at 2866 (discussing Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). I believe imposing the death penalty on mentally retarded defendants is excessive, serves no purpose except to dispose of those some might deem to be “unacceptable members” of society, and therefore, is “cruel.”
Second, executing a mentally retarded defendant such as Hall is “unusual” because it is disproportionate. Because mentally retarded individuals are not as culpable as other criminal defendants, I would find that the death penalty is always disproportionate when the defendant is proven to be retarded. However, even without a per se rule, Hall’s mental retardation and his horrible childhood represent substantial mitigation, which makes the death penalty disproportionate despite the existence of several aggravating factors. See, e.g., Nihert v. State, 574 So.2d 1059, 1063 (Fla. 1990); Smalley v. State, 546 So.2d 720 (Fla.1989); Blakely v. State, 561 So.2d 560 (Fla.1990). This case is illustrative of far too many cases we see at this Court; horrible crimes are repeatedly committed by those who endure sickening abuse and deprivation as children. Many, like Freddie Lee Hall, are also mentally retarded and suffer particularly severe abuse because their parents do not understand the nature of retardation. The connection between an individual’s childhood and his or her later ability to function as a productive member of society is obvious to those of us who routinely review criminal cases, and while a tragic childhood and mental retardation do not “excuse” later criminal behavior, they do reflect on an individual’s culpability.
The law requires that the death penalty be reserved for the most heinous of crimes and the most culpable of murderers. See, e.g., Songer v. State, 544 So.2d 1010, 1011 (Fla.1989); State v. Dixon, 283 So.2d 1, 8 (1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The crime committed in this case undoubtedly was heinous. A young woman, seven months pregnant, was raped, beaten, and shot to death. The horrible nature of this crime is *482 uneontroverted, and it is certainly among the types of offenses for which the death penalty may be imposed. However, Freddie Lee Hall is not among the most culpable of murderers. Hall’s judgment, thought processes, and actions are unquestionably affected by his mental retardation. He cannot understand right from wrong in the way that most members of our society do, and while he should spend the rest of his life in prison, he should not be executed.
In evaluating both the “cruel” and “unusual” punishment prohibitions of article I, section 17 and the evolving standards of decency in Florida regarding the mentally retarded, I find that executing the mentally retarded violates the state constitution. Consequently, I would remand Hall’s case for imposition of a sentence of life imprisonment.
KOGAN, J., concurs.

. In determining its state standards of decency, the Georgia court relied in part on a prospective legislative enactment that was passed after the trial of the defendant. Fleming v. Zant, 386 S.E.2d 339, 342 (Ga.1989). The Georgia statute was a response to public outrage over the 1986 execution of Jerome Bowden, a mentally retarded man with an IQ of 59. V. Stephen Cohen, Comment, Exempting the Mentally Retarded from the Death Penalty: A Comment on Florida ⅛ Proposed Legislation, 19 Fla.St.U.L.Rev. 457, 468 n. 117 (1991).

. Unlike the Eighth Amendment, which prohibits cruel and unusual punishment, article I, section 17 prohibits cruel or unusual punishment. The use of the disjunctive indicates that alternatives were intended. Tillman v. State, 591 So.2d 167, 168 n. 2 (Fla.1991).